IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


GEOFFREY NEAL BLAKE                                                    PLAINTIFF


         v.                          Civil No. 09-5154


CAPTAIN HOLLY; SHERIFF
FERGUSON; and DR. HUSKINS                                              DEFENDANTS


### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

The Plaintiff, Geoffrey Neal Blake, filed this civil rights action pursuant to 42 U.S.C. §

1983.  He proceeds *pro se*.

Plaintiff is currently an inmate of the Ouachita River Correctional Unit of the Arkansas

Department of Correction (ADC).  The events at issue in this action occurred while Plaintiff was

incarcerated in the Benton County Detention Center (BCDC) from June 29, 2009, until his

transfer to the ADC on November 23, 2009.  While at the BCDC, Plaintiff contends he was

denied adequate medical care and subjected to unconstitutional conditions of confinement.

Defendants filed a summary judgment motion (Doc. 26).  Plaintiff filed a response to the

motion within the time specified by the Court (Doc. 34).  The motion is now ready for decision.

### Background

On June 26, 2009, apparently in anticipation of his incarceration, Plaintiff's attorney

obtained a letter addressed to whom it may concern from Plaintiff's primary care physician, Dr.

Marlan Rhane, Veterans Health Care System of the Ozarks.  Defendants' Exhibit (hereinafter

Defts' Ex.) 1 at page 1-2.  The letter indicated that Plaintiff had a medical history of bursitis and

-1-

limited motion in the lumbar spine that required a thicker mattress.  Id. at page 2.  Dr. Rhane asked that Plaintiff be allowed to have "at least a minimum three inch foam mattress."  Id.

On June 29th, Plaintiff was booked into the BCDC on felony criminal charges.  Defts' Ex. 2 at pages 1-2.  That same day, Plaintiff appeared in court and was sentenced to seven years in the ADC.  Id. at page 3.

As part of the booking process, Plaintiff signed an inmate medical insurance form indicating he had insurance and was agreeing to be responsible for all medical bills stemming from any pre-existing injury or illness.  Defts' Ex. 3 at page 1.  A medical questionnaire was completed indicating Plaintiff was currently taking heartburn medication, Crestor for high cholesterol, nerve medication, and sleep medication.  Id. at page 2.  It was also noted that he had a spinal fusion and could not get on a top bunk.  Id.

Plaintiff submitted a written medical request on that day noting he needed his daily Aciphex/Crestor.[1]  Defts' Ex. 4 at page 1.  He stated he had brought these medications with him when booked in.  Id.  He also requested Motrin/Tylenol for his back.  Id.  Finally, he noted that his attorney had presented a written request for bedding due to his 70% medical disability.  Id.  In response, Plaintiff was put on the list to see the doctor.  Id.

On July 1st, Plaintiff was seen by Dr. Huskins and prescribed Zocor[2], Pepcid, and Tylenol. Defts' Ex. 3 at page 4.  The nurse noted that per Dr. Huskins' authorization a thicker

---

[1] Aciphex is a brand name for Rabeprazole.  This drug is used to treat conditions where the stomach produces too much acid. www.nlm.nih.gov/medlineplus/druginfor/meds  Crestor is brand name for Rosuvastatin.  The drug is also used to reduce high cholesterol. www.nlm.nih.gov/medlineplus/druginfor/meds

[2] Zocor is a brand name for Simvastatin.  The drug is used to reduce high cholesterol. www.nlm.nih.gov/medlineplus/druginfor/meds

AO72A
(Rev. 8/82)

mat should be obtained for Plaintiff's use. Id. Sgt. Nance was notified and stated she would get him a trustee's mat.[3] Id.

Plaintiff submitted a grievance dated July 1st stating that he had to sleep on the floor and awoke in pain. Defts' Ex. 5 at page 1. He stated he had been asking repeatedly for a "boat[4]" and no one got for one for him. Id. Fortunately, Plaintiff stated he had found one himself. Id. He also asked that his wife be allowed to bring him in a back brace. Id. Lt. Carter responded indicating Plaintiff had an extra thick mat and had been spoken to about this matter. Id. Further, Lt. Carter stated that once the back brace was brought in it would be examined by the medical staff. Id. See also Defts' Ex. 5 at page 2 (Separate request to be allowed to receive a back brace. Told in response that the medical staff made the medical decisions and he should put in a medical request).

On July 4th, Plaintiff submitted a medical request asking that his back medication be increased at night time to help him sleep. Defts' Ex. 4 at page 2. He also asked to be allowed to wear his velcro back brace during the day. Id. In response, he was put on the list to see the doctor. Id.

Dr. Huskins saw Plaintiff on July 8th. Defts' Ex. 3 at page 4. Dr. Huskins noted that Plaintiff was complaining of back pain and difficulty sleeping. Id. Plaintiff was prescribed Amitriptyline[5] and told his back brace would be evaluated. Id.

---

[3] The record contains no information on the thickness of a trustee's mat.

[4] A boat is type of temporary bunk typically consisting of a plastic shell in which a mattress is placed.

[5] Amitriptyline is used to treat depression.

AO72A
(Rev. 8/82)

On July 9th, Plaintiff asked to see the doctor to request bed rest for his back.  Defts' Ex. 4 at pag 3.  He stated he did not want to be placed in  isolation, where he would be locked down twenty-three hours a day, in order to use his back brace.  Id.  However, with no lumbar support, he stated the current medication dosage was not working.  Id.  In response, it was noted he had seen the doctor on July 8th.  Id.  On July 11th, Plaintiff submitted another request to see the doctor about his back.  Id. at page 4.

Dr. Huskins examined Plaintiff on July 13th.  Defts' Ex. 3 at page 4.  Dr. Huskins continued the Tylenol and approved Plaintiff's use of the brace.  Id.   Bed rest was also authorized.  Id.

According to Captain Holly, an examination of Plaintiff's back brace revealed it was constructed of removable metal parts.  Affidavit of Captain Holly (Doc. 28) at ¶ 18.  Plaintiff was informed that he was authorized to wear the back brace in a segregated area only due to the number of removable metal parts.  Id. at ¶ 19.  It was feared that in general population the brace could be disassembled and the parts used as weapons.  Id. at ¶ 20.  Plaintiff maintains the brace consisted of a twelve inch wide "adhesive" wrap with velcro to tighten it around his mid-section.  Plaintiff's Response (Doc. 34)(hereinafter Resp.) at page 34.  Because it meant he would have to go into segregated housing, Plaintiff elected not to use the brace.  Affidavit of Captain Holly. at ¶ 21.

On July 16th, Plaintiff submitted a medical request stating that his right arm and leg had been going numb and the fingers on his right hand tingled.  Defts' Ex. 4 at page 5.  He was put on the list to see the doctor.  Id.

AO72A
(Rev. 8/82)

The following day, Plaintiff was examined by Dr. Huskins. Defts' Ex. 3 at page 5. Plaintiff was put on bed rest. Id. A notation was made by the nurse that Deputy Bonfante was notified. Id.

On July 18th, Plaintiff submitted a grievance regarding the lack of communication concerning the doctor's orders from one shift to another. Defts' Ex. 5 at page 5. In response, Captain Holly said: "I will look into this & see if we can get some things changed." Id.

On August 6th, Plaintiff submitted a grievance complaining that Dr. Huskins had said the strongest medication that they use is Tylenol. Defts' Ex. 4 at page 6. Plaintiff indicated deputies had also told him that no controlled narcotics were distributed at the jail. Id. He asserted that Tylenol was not working on his back pain. Id. He indicated he had been on Vicodin and Motrin and asked why these medications could not be distributed by the nurse. Id. He stated the medications, the brace, and being able to walk around would help his back. Id. In response, Plaintiff was told: "We do not give narcotics here." Id.

Plaintiff next submitted a medical request on August 8th. Defts' Ex. 4 at page 7. He asked that his Tylenol be extended as this was the only medication he was receiving for his back. Id. He stated he would prefer a muscle relaxer. Id. Plaintiff was put on the list to see the doctor. Id. On August 10th, Plaintiff submitted a request to see the doctor for continued back pain. Defts' Ex. 4 at page 8. He asked for an increased dosage or another type of medication. Id. On August 11th, Plaintiff submitted a grievance asking what happened to his prior requests for a lower bunk. Defts' Ex. 5 at page 8. In response, he was told he should be moved. Id. Plaintiff was also seen by Dr. Huskins and authorized to receive Tylenol, 500 mg., twice a day, for thirty days. Defts' Ex. 3 at page 5.

AO72A
(Rev. 8/82)

On August 15th, Plaintiff submitted a medical request asking if his sleeping medication could be increased because he had been moved into a cell with two people who snore. <u>Defts'</u> <u>Ex.</u> 4 at page 9. He also asked for an additional mat because his bursitis was flaring up at night. <u>Id.</u> His requests were refused. <u>Id.</u>

Plaintiff submitted a grievance on August 16th complaining that the trustees were not properly cleaning the day-room and pod. <u>Defts' Ex.</u> 5 at page 10. He also stated the trustees complained about inmates' submitting grievances regarding the cleaning. <u>Id.</u> In response, Plaintiff was told this would be addressed that day with the deputies and trustees. <u>Id.</u> If the problem continued, he was asked to inform Captain Holly. <u>Id.</u>

On August 19th, Plaintiff requested an increase of the dosage of his nighttime sleep aid. <u>Defts' Ex.</u> 4 at page 10. In response, he was told they did not give out sleeping pills. <u>Id.</u> Plaintiff also submitted a request for medication because of cold like symptoms. <u>Id.</u> at page 11. He was provided with Sudafed. <u>Defts' Ex.</u> 3 at page 5.

On August 20th, Plaintiff submitted a medical request asking that his Amitriptyline be increased from 25 mg. to 50 mg. <u>Defts' Ex.</u> 4 at page 12. In response, he was placed on the list to see the doctor.

Plaintiff submitted his next grievance about the failure of the trustees to clean the day-room and various other areas of the pod on August 21st. <u>Defts' Ex.</u> 5 at page 11. In response, he was told that the inmates could clean their own pods. <u>Id.</u>

Plaintiff was seen by Dr. Huskins on August 24th. <u>Defts' Ex.</u> 3 at page 5. He complained of problems sleeping and was prescribed Elavil.[6] <u>Id.</u>

---

[6]Elavil is a brand name for Amitriptyline. www.nlm.nih.gov/medlineplus/druginfor/meds

-6-

Plaintiff complained on August 29th, that the sergeants and corporals were not handing out request forms. Defts' Ex. 5 at page 12. In response, Captain Holly said this was not true because he had been receiving requests and grievances from Plaintiff's pod. Id.

That same day, Plaintiff submitted a grievance about not having received books left for him by his wife on August 27th. Defts' Ex. 5 at page 13. He said he had been told he should have the books by the 28th and he still had not received them. Id. In response, a notation was made that Plaintiff was given the books on August 31st. Id. He was told the books needed to be inspected and no one was there on the 28th to inspect them. *Id.*

On September 5th, Plaintiff submitted a grievance stating that for the last several weeks the only books on the cart were religious books. Defts' Ex. 5 at page 14. He asked for a variety to choose from. Id. In response, he was told the books on the cart were all that was available. Id.

On September 6th, Plaintiff complained about the portion size of the food he had been receiving for the last couple of weeks. Defts' Ex. 5 at page 15. He asserted there was no consistency in the portion size and he did not believe he was receiving a 2300 calorie diet. Id. He asked for the name of the dietician who oversees the daily food preparation. Id. In response, he was told that Captain Holly did not have the dietician's name. Id. Plaintiff was, however, provided with the name of the company in charge of food service. Id.

On September 8th, Plaintiff submitted a request to continue the Tylenol for his back pain. Defts' Ex. 4 at page 13. He also asked if there was any reason he could not be provided with a stronger medication. Id. In response, the Tylenol prescription was extended. Id. Plaintiff was also informed that Tylenol was what the doctor had ordered for his back pain. Id.

AO72A
(Rev. 8/82)

Plaintiff again complained about the portion size of his meals on September 9th. Defts'
Ex. 5 at page 16. He stated that he did not believe the current meal plan provided a well-
balanced diet. Id. In response, he was told the menu was prepared by a registered dietician. Id.

Plaintiff submitted another grievance regarding food portions the following day. Defts'
Ex. 5 at page 18. He noted that the portion of cake he received that evening had been small and
also looked like a bite had been taken out of it. Id. He stated he was convinced he was not
receiving 2300 calories. *Id.* In response, he was told that the kitchen staff had been notified.
Id.

On September 16th, Plaintiff requested an extension on his Tylenol prescription. Defts'
Ex. 4 at page 14. His request was approved by the nurse. Id. See also Defts' Ex. 3 at page 5.

On September 22nd, Plaintiff requested medication for a head cold. Defts' Ex. 4 at page
15. The following day, he was given Sudafed. Id. See also Defts' Ex. 3 at page 5.

On September 24th, Plaintiff submitted a medical request stating that in addition to the
head cold he was getting a sore throat. Defts' Ex. 4 at page 16. He was put on the list to see the
doctor. Id. He was seen the following day and prescribed Cipro.[7] Defts' Ex. 3 at page 3.

On October 15th, Plaintiff asked that his Tylenol prescription that would run out on
October 23rd be extended. Defts' Ex. 4 at page 18. In response, he was told to send in another
request a few days before the current order ran out and it would be extended. Id.

---

[7]Cirpo is a brand name for Ciprofloxacin. The drug is used to treat or prevent infections caused by bacteria.
www.nlm.nih.gov/medlineplus/druginfor/meds

AO72A
(Rev. 8/82)

On October 16th, Plaintiff was given another prescription for Elavil. Defts' Ex. 3 at page 3. Plaintiff complained of dry feet on October 11th. Defts' Ex. 4 at page 17. On October 13th, Vaseline was ordered. Id.

Plaintiff again asked for medication for a head cold on October 17th. Defts' Ex. 4 at page 19. He was provided with Sudafed. Defts' Ex. 3 at page 3.

On October 19th, Plaintiff submitted a request to have his current Tylenol prescription extended. Defts' Ex. 4 at page 20. On the 21st, the Tylenol was re-ordered. Defts' Ex. 3 at page 3.

During his incarceration at the BCDC, Plaintiff received Simvastatin, Famotidine, Acetaminophen, Amitriplyine, nasal decongestant, and Ciprofloxacin, Defts' Ex. 3 at pages 10-21. He was also placed on bed rest a number of times. Id.

The last medical record regarding Plaintiff's treatment at the BCDC is dated October 21st. Defts' Ex. 3 at page 3. Plaintiff indicates he was transferred to the ADC on November 23, 2009. See Resp. at page 7.

### Summary Judgment Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence,

-9-

showing that a genuine issue of material fact exists." National Bank of Commerce v. Dow Chem. Co., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586.  "They must show there is sufficient evidence to support a . . . verdict in their favor." National Bank, 165 F.3d at 607 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).  "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." Id. (citing Metge v. Baehler, 762 F.2d 621, 625 (8th Cir. 1985)).

## Discussion

Defendants have now moved for summary judgment.  First, Defendants argue that the case must be construed to be against them in their official capacities only because Plaintiff did not indicate in the complaint that he was asserting individual capacity claims against them.   As there is no proof of an unconstitutional custom or policy, Defendants maintain they are entitled to judgment as a matter of law.  Second, Defendants argue that Plaintiff was not denied adequate medical care.  Defendants maintain that Plaintiff saw the jail medical personnel on numerous occasions, was provided with medication, and received all medical treatment and/or medication ordered. Third, Defendants maintain that Plaintiff's claims regarding the conditions under which he was confined fail to rise to the level of a constitutional violation.  Finally, Defendants maintain they are entitled to judgment as a matter of law fail because Plaintiff has suffered no actual physical injury.

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the

AO72A
(Rev. 8/82)

United States.  In order to state a claim under 42 U.S.C. § 1983, plaintiff must allege that the

defendants acted under color of state law and that they violated a right secured by the

Constitution.  Dunham v. Wadley, 195 F.3d 1007, 1009 (8th Cir.1999).  The deprivation must

be intentional; mere negligence will not suffice to state a claim for deprivation of a constitutional

right under § 1983.  Daniels v. Williams, 474 U.S. 327 (1986); Davidson v. Cannon, 474 U.S.

344 (1986).

### *Official Capacity and Individual Capacity Claims*

Under § 1983, a defendant may be sued in either his individual capacity, or in his official

capacity, or in both.  In Gorman v. Bartch, 152 F.3d 907 (8th Cir. 1998), the Eighth Circuit

discussed the distinction between individual and official capacity suits.  As explained by the

Gorman case:

> Claims against government actors in their individual capacities differ from those
> in their official capacities as to the type of conduct that is actionable and as to the
> type of defense that is available. *See Hafer v. Melo*, 502 U.S. 21, 112 S. Ct. 358,
> 116 L. Ed. 2d 301 (1991).  Claims against individuals in their official capacities
> are equivalent to claims against the entity for which they work; they require proof
> that a policy or custom of the entity violated the plaintiff's rights, and the only
> type of immunity available is one belonging to the entity itself.  Id. 502 U.S. at
> 24-27, 112 S. Ct. at 361-62 (1991).  Personal capacity claims, on the other hand,
> are those which allege personal liability for individual actions by officials in the
> course of their duties; these claims do not require proof of any policy and
> qualified immunity may be raised as a defense.  Id. 502 U.S. at 25-27, 112 S. Ct.
> at 362.

Gorman, 152 F.3d at 914.

The Eighth Circuit has consistently advised plaintiffs to specifically plead whether

government agents are being sued in their official or individual capacities to ensure prompt

notice of potential personal liability.  Nix v. Norman, 879 F.2d 429, 431 (8th Cir. 1989); see also

Andrus v. Arkansas, 197 F.3d 953 (8th Cir. 1999)(In actions against officers, specific pleading

-11-

of individual capacity is required to put public officials on notice they will be exposed to personal liability).  When the plaintiff fails to state whether he is suing an official in his individual capacity, the Eighth Circuit has construed the claim to be against the official in his official capacity only.  See Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999)("[I]n order to sue a public official in his or her individual capacity, a plaintiff must expressly and unambiguously state so in the pleadings, otherwise, it will be assumed that the defendant is sued only in his or her official capacity"); Egerdahl v. Hibbing Comm. Coll., 72 F.3d 615, 620 (8th Cir. 1995)("*Nix* requires that a plaintiff's complaint contain a clear statement of her wish to sue defendants in their personal capacities.  Neither a cryptic hint in a plaintiff's complaint nor a statement made in response to a motion to dismiss is sufficient").

In his response to the summary judgment motion, Plaintiff indicates he was unaware of the distinctions between individual and official capacities claims when he filed this lawsuit.  See Resp. at page 5.  A distinction at times difficult for even those with legal training to make.  See e.g., Vanhorn v. Oelschlager, 502 F.3d 775, 779 (8th Cir. 2007)(state officials misconstrue the distinctions between official and individual capacity claims and the immunities available).  Given the duty of the Court to liberally construe *pro se* pleadings and Plaintiff's statement in his summary judgment response and the fact that it does not appear Defendants will be unfairly prejudiced in anyway, we will construe the complaint as asserting individual capacity claims against the Defendants.

Although Plaintiff makes statements indicating he did not intend to assert official capacity claims, we note that he goes onto argue that several policies, customs, or practices of the BCDC resulted in his being denied adequate medical care.  Resp. at page 5.  We therefore

conclude Plaintiff intends to pursue both individual and official capacity claims against the Defendants.

### *Denial of Adequate Medical Care Claim*

The Eighth Circuit analyzes both a pretrial detainee's and a convicted inmate's claim of inadequate medical care under the deliberate indifference standard. See Butler v. Fletcher, 465 F.3d 340, 344 (8th Cir. 2006). To prevail on an Eighth Amendment claim, Plaintiff must prove that Defendants acted with deliberate indifference to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 106 (1976). The deliberate indifference standard includes "both an objective and a subjective component: 'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000)(quoting Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir.1997)).

"For a claim of deliberate indifference, the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation. Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." Popoalii v. Correctional Med. Servs, 512 F.3d 488, 499 (8th Cir. 2008)(internal quotation marks and citations omitted).

In this case, Plaintiff concedes he was seen numerous times by Dr. Huskins. See Resp. at page 7. However, he asserts "there was never an examination of [his] back, testing of his range of motion, nor asking [about the] degree of pain/discomfort." Id. He maintains the majority of the sick calls lasted less than one minute. Id. He points out there was no pain management or treatment plan for his chronic condition and no consultation with his doctor at the Veterans Hospital or review of his past medical records to assist in forming such a plan. Id.

-13-

He also points out that Tylenol was the only medication prescribed for pain and the blanket policy of the detention center was not to provide any type of narcotic pain medication without consideration of the needs of the individual patient. Id. at page 18. Finally, he maintains this policy is based on non-medical reasons such as cost or the unavailability of personnel. Id.

Defendants maintain that the facts, at most, establish a disagreement with the medical treatment Plaintiff received while he was incarcerated. As Defendants accurately point out, medical personnel are given "considerable latitude . . . in the diagnosis and treatment of medical problems of inmates." Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979). It is well settled that a "prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." Nelson v. Shuffman, 603 F.3d 439, 449 (8th Cir. 2010)(internal quotation marks and citation omitted). An "inmate must clear a substantial evidentiary threshold to show the prison's medical staff deliberately disregarded the inmate's needs by administering inadequate treatment." Id. Despite this, issues of fact exist when there is a question of whether or not medical staff exercised independent medical judgment and whether the decisions made by medical staff fell so far below the reasonable standard of care as to constitute deliberate indifference. See Smith v. Jenkins, 919 F.2d 90, 93 (8th Cir. 1990).

In this case, there is no evidence in the jail medical records suggesting medical staff inquired as to the treatment plan, if any, developed by Dr. Rhane, Plaintiff's primary care physician. The record indicates that the policy was not to provide narcotic medications for pain relief. From the record evidence, it appears this policy was applied without regard to the medical condition of the inmate. Plaintiff submitted repeated requests stating that Tylenol was inadequate in providing pain relief. There is no indication that other pain medications, narcotic

-14-

AO72A
(Rev. 8/82)

or not, were considered.  Nothing in the record suggests medical personnel considered Plaintiff's complaints of pain to be exaggerated or not supported by his medical condition.

Additionally, while a medical questionnaire was completed when Plaintiff was booked in and notations were made regarding several of his medical problems including the fact that he had underwent a spinal fusion and could not get on a top bunk, there is no evidence that the information elicited on the questionnaire was utilized by jail personnel to ensure Plaintiff was properly housed, received proper medical treatment, or for any other purpose.  Plaintiff contends that having to sleep on the floor for forty-five days "despite the medical conditions was the root cause of [his] chronic lower back pain being re-aggravated."  Resp. at page 31.

In this case, I believe there are genuine issues of fact as to whether each of the Defendants exhibited deliberate indifference to Plaintiff's serious medical needs.  While supervisors cannot be held liable on a theory of *respondeat superior*, they may be held liable if they knew the prisoner's "serious medical needs were not being adequately treated yet remain indifferent." Langford v. Norris, No. 09-1862, 2010 WL 2813551, *10 (8th Cir. July 20, 2010)(citation omitted).  Captain Holly responded to the majority of Plaintiff's requests and grievances and therefore had actual knowledge of Plaintiff's serious medical needs and of his complaints of inadequate treatment.  It is also reasonable to assume that Captain Holly, as jail administrator, was responsible for training the jail personnel in charge of processing the medical intake questionnaire.

Similarly, I believe there are issues of fact as to whether the County's policies, or lack thereof, caused, or contributed to, the alleged inadequacies and delay in the provision of medical care and prescription medications.  County policy, in regard to the care and custody of detainees, is, of course, established by the Sheriff.  Ark. Code Ann. § 12-41-502 (Supp. 2010)("The county

-15-

AO72A
(Rev. 8/82)

sheriff of each county in this state shall have the custody, rule, and charge of the jail within his or her county and all prisoners committed in his or her county, and he or she may appoint a jailer for whose conduct he or she shall be responsible.").

### *Conditions of Confinement*

It is obvious from Plaintiff's response to the summary judgment motion that he is not asserting a separate claim that he was subjected to unconstitutional conditions of confinement. Resp. at pages 30-31. Rather, he maintains that overcrowding, the failure to allow him to utilize his back brace unless he moved to segregated housing, and the other conditions he was subjected to resulted in the aggravation of his chronic lower back pain and constitute examples of the Defendants overlooking his serious medical needs

### *Physical Injury Requirement*

Defendants maintain they should be granted judgment as a matter of law because Plaintiff suffered no physical injuries as required by the Prison Litigation Reform Act (PLRA). Codified as 42 U.S.C. § 1997e(e), section 803(d) of the PLRA provides as follows: "No Federal civil action may be brought by a prisoner confined in jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."

The provision limits the available damages in the absence of a physical injury but does not preclude a plaintiff from pursuing a claim. See Royal v. Kautzky, 375 F.3d 720, 723 (8th Cir. 2004)(The physical injury requirement of the PLRA "limit[ed] recovery for mental or emotional injury in all federal actions brought by prisoners" but does not bar the recovery of nominal and punitive damages); see also Pool v. Sebastian County, 418 F.3d 934, 942 n.2 (8th Cir. 2005)(Section 1997e(e) presents an issue of damages under the PLRA). As Plaintiff's denial of medial care claims will proceed, we decline at this point to attempt to determine whether his

AO72A
(Rev. 8/82)

claimed injuries of pain caused by an aggravation of a chronic back condition are sufficient to enable him to recover damages for his mental pain and suffering under § 1997e(e).

### Conclusion

For the reasons stated, I recommend that Defendants' motion for summary judgment (Doc. 26) be granted in part and denied in part.  Specifically, I recommend the motion be granted with respect to Plaintiff's conditions of confinement claims and denied with respect to his denial of medical care claims.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED** this **6th day of August 2010.**

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)